UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

LORENZO GEETER, Personal
Representative of the Estate of
Leonard Geeter,

       Plaintiff,

                               File No.  2:08-CV-44

v.

                               HON. ROBERT HOLMES BELL

ROSS SHUBERT and TERRY WILKINS,

       Defendants.
_____/

**O P I N I O N**

On June 5, 2005, Leonard Geeter died of a massive pulmonary thromboembolism while he was a prisoner in the custody of the Michigan Department of Corrections.  Plaintiff Lorenzo Geeter, personal representative of the estate of Leonard Geeter, filed this civil rights action against Defendants Ross Shubert and Terry Wilkins, resident unit officers at the prison, who were on duty the night of Leonard Geeter's death.  This matter is before the Court on Defendants' motion for summary judgment.  (Dkt. No. 10).  For the reasons that follow Defendants' motion will be granted.

**I.**

On June 5, 2005, Leonard Geeter ("Geeter") was housed in Steamboat Unit, the segregation unit at the Chippewa Correctional Center ("URF") in Kincheloe, Michigan.  He was 34 years old.  On that date, Defendants Terry Wilkins and Ross Shubert worked the

2:00 p.m. to 10:00 p.m. shift in Steamboat Unit. Wilkins was the desk officer and Shubert was assigned to B-Wing where Geeter was housed. (Dkt. No. 11, Defs.' Br., Ex. 3, Wilkins Aff. ¶¶ 3-4, and Ex. 4, Shubert Aff. ¶ 3.)

On that date Geeter complained that he was not feeling well and that he needed medication for breathing. (Pl. Ex. 6, p. 22.) (Pl. Ex. 6, p. 22.) At 7:30 p.m. Defendant Shubert advised Defendant Wilkins that Geeter needed to be seen by health care. (Shubert Aff. ¶ 7; Wilkins Aff. ¶ 4.) Wilkins contacted Nurse Wendy Ball in health care at 7:30 p.m. and advised her of Geeter's complaints. (Wilkins Aff. ¶ 5; Ball Aff. ¶ 4; Pl. Ex. 6, p. 22). Nurse Ball came to Steamboat Unit to check on Geeter at 7:38 p.m. (Shubert Aff. ¶ 7; Wilkins Aff. ¶ 5.) At 7:40 p.m. Nurse Ball talked to Geeter at his cell. Geeter told her he was fine and refused health care. Geeter did not appear to be in any distress. He was calm, and he was able to breathe and move without difficulty. (Pl. Ex. 6, p. 23; Ball Aff. ¶ 5.)

At 9:35 p.m. Nurse Ball called the segregation unit and asked the officer to check on Geeter. (Ball. Aff. ¶ 8.) The officer returned the call and reported that Geeter was lying on the floor and breathing. (Ball Aff. ¶ 8.) Nurse Ball returned to the segregation unit at 10:08 p.m. to recheck Geeter. Geeter was on the floor and appeared to be breathing. (Ball Aff. ¶ 9; Pl. Ex. 6, p. 24.) Nurse Ball and the officers entered the cell and found that Geeter was unresponsive, was not breathing, and had no pulse. (Ball Aff. ¶ 9; Pl. Ex. 6, p. 24.) Nurse Ball and the officers immediately initiated CPR and requested an AED and an ambulance. (Ball Aff. ¶ 9; Pl. Ex. 6, p. 24.) The ambulance was summoned at 10:14 p.m. and the

paramedics were at Geeter's cell at 10:20. p.m. (Pl. Ex. 2, p. 1.) Geeter had no pulse, and was not breathing. His skin was blue, he was cold to the touch, and his extremities were stiff. (Pl. Ex. 2, p. 1.) Geeter was transported to the hospital at 10:38 p.m. (Ball Aff. ¶ 11.) Geeter was pronounced dead on arrival at Chippewa County War Memorial Hospital at 10:58 p.m. (Ball Aff. ¶ 12; Pl. Ex. 2, p. 1; Pl. Ex. 3, p. 3.)

The report of the post mortem examination found massive bilateral pulmonary thromboembolus and deep venous thrombosis of his right leg and determined the cause of death to be pulmonary thromboembolus. (Pl. Ex. 4, p. 4.) Geeter's certificate of death indicates that the causes of death were massive pulmonary thromboembolism and deep venous thrombosis in his right leg. (Defs. Ex. 1 at ¶ 36.) The death certificate also indicates that the approximate interval between onset and death was "minutes." (*Id.*)

Plaintiff's complaint alleges three causes of action: a federal claim under 42 U.S.C. § 1983 for violation of the Eighth Amendment and two state claims for gross negligence and intentional infliction of emotional distress.

## II.

Defendants have moved for summary judgment on the basis of qualified immunity. Under the doctrine of qualified immunity, government officials who perform discretionary functions are generally shielded from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In this circuit

the analysis of the qualified-immunity defense generally proceeds under the two-step, sequential inquiry articulated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 201 (2001). *Parsons v. City of Pontiac*, 533 F.3d 492, 500 (6th Cir. 2008).[1]  The threshold question under *Saucier* is whether the facts, viewed in the light most favorable to the party asserting the injury, show that the defendant's conduct violated a constitutional right. *Saucier*, 533 U.S. at 201.  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."  *Id.*  "If the plaintiff does not establish the violation of a constitutional or statutory right, the inquiry ends there and the official is entitled to immunity."  *Perez v. Oakland County*, 466 F.3d 416, 426-27 (6th Cir. 2006).  "On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established."  *Saucier*, 533 U.S. at 201.  "Evaluating the defense of qualified immunity on a motion for summary judgment requires that we 'adopt[ ] . . . the plaintiff's version of the facts.'"  *Parsons*, 533 F.3d at 500 (quoting *Scott v. Harris*, --- U.S. ----, 127 S.Ct. 1769, 1775 (2007)).

Plaintiff alleges that Defendants violated Geeter's Eighth Amendment right to be free from cruel and unusual punishment by denying and delaying his access to medical care.

---

[1] Some cases add a third step to the inquiry, asking whether the official's action was objectively unreasonable under the circumstances. *See*, *e.g.*, *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008).  In light of this Court's determination that qualified immunity is available at the first step of the sequential inquiry, the Court need not apply the second or third step of the inquiry.

"The Eighth Amendment forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A deliberate indifference claim has both an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "The objective component requires the existence of a 'sufficiently serious' medical need." *Blackmore*, 390 F.3d at 895 (citing *Farmer*, 511 U.S. at 834; *Estelle*, 429 U.S. at 104). "The subjective component requires an inmate to show that prison officials have 'a sufficiently culpable state of mind in denying medical care.'" *Id.* (quoting *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000)).

Turning first to the objective component, the Court must determine whether, viewing the evidence in the light most favorable to Plaintiff, Plaintiff has established that Geeter's medical needs were "sufficiently serious." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008). "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* (quoting *Blackmore*, 390 F.3d at 897). "'Where the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person,' this obviousness is itself sufficient to satisfy the objective component of the adequate medical care test." *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005) (quoting *Blackmore*, 390 F.3d at 899).

5

The post mortem examination of Geeter's body revealed that he had a deep venous thrombosis in his right leg that resulted in a massive bilateral pulmonary thromboembolus that caused his death. (Pl. Ex. 4.) However, there is no evidence that this medical condition had been diagnosed by a physician even though Geeter had been seen by medical personal numerous times in the weeks leading up to his death.

Geeter was seen by a nurse on April 27, 2005, after complaining of headaches and a sore back and leg. Geeter gave the following history of his condition:

> States he has had little to no physical exercise in the past year, and has begun exercising in cell x2 weeks. States he works out for about 2-3 hours straight about once a week. 2 days ago tripped while going up stairs. Caught himself with right leg. Denies having any pain immediately after tripping, but right calf began to ache the next day. States that it was a little tender to walk on yesterday, but today is much better. Today it only hurt when he was standing up in cell for long period of time.

(Pl. Ex. 6, at p. 12.) The nurse diagnosed a calf strain and prescribed acetaminophen. (*Id.* at 12-13.) On May 4, Geeter saw the nurse for a recheck of his leg sprain and he denied any discomfort. (*Id.* at 14.)

On May 6, Geeter was seen by a nurse regarding his complaints that he had been having migraine headaches on and off for the past couple of weeks, full sinuses, a stuffy nose and a sore throat. (Pl. Ex. 6, pp. 15, 17.) The nurse prescribed acetaminophen and allergy medicine and advised Geeter to call if he had blurred vision, increased headaches, a change in the character of the headaches, or dizziness. (*Id.* at 17.)

On May 24, Geeter was escorted to health services after experiencing a little vertigo

after working out. (Pl. Ex. 6, p. 19.) Geeter advised the nurse "I think I may have overdone it and felt a little light headed and dizzy after I was working out and sat down and felt a little weak but I went back to my cell drank some water and had something to eat and I feel a lot better." (Pl. Ex. 6, p. 18.)

On May 27, Geeter was seen by a nurse regarding recurring symptoms of vertigo and malaise. (Pl. Ex. 6, p. 20.) Geeter wondered if his episodes of dizziness could be from working out too much or from sugar. (*Id.*) Geeter was rechecked on June 1, 2005, at which time he denied any dizziness. (*Id.* at 21.)

In hindsight it is possible to question whether the symptoms Geeter had reported over the course of the preceding weeks might have been related to his deep venous thrombosis. There is no evidence, however, that any of the medical personnel who examined him drew this connection, or that they had any idea that Geeter had a serious medical condition. Because Geeter's serious medical condition was not obvious to the medical staff, there is no basis for finding that it would have been obvious to lay persons such as Defendants who did not have medical training, did not examine Geeter, and did not have access to Geeter's medical records.

The seriousness of Geeter's condition was not apparent to the medical staff even on the night of his death. Geeter was seen by a nurse at 7:40 p.m. after he complained to Defendant Shubert that he was having difficulty breathing. Although Geeter refused treatment from the nurse, the nurse was able to observe him and speak with him at the cell

7

side. Geeter told the nurse he was fine and, according to the nurse, he did not appear to be in any distress. "He was calm, respirations easy and he was able to move without difficulty." (Ball Aff. ¶ 5.) Because the nurse did not recognize the seriousness of Geeter's condition on the evening of his death, there is no basis for finding that the seriousness of his condition should have been obvious to Defendants.

The fact that Geeter's need for medical care was not obvious does not end the Court's inquiry under the objective component. "Where the claimed injury is minor or nonobvious, 'the seriousness of a prisoner's medical needs may also be decided by the effect of a delay in treatment.'" *Lockett v. Suardini*, 526 F.3d 866, 877 (6th Cir. 2008) (quoting *Blackmore*, 390 F.3d at 897). However, "'[v]erifying medical evidence' is required in those cases to 'assess whether the delay caused a serious medical injury.'" *Id.* (quoting *Blackmore*, 390 F.3d at 898). *See also Johnson*, 398 F.3d at 874 (holding that if the need involves minor maladies or non-obvious complaints of a serious need for medical care, the inmate must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment).

Plaintiff has alleged that treatment was delayed, and he has presented affidavits from two prisoners who have stated that Defendants ignored Geeter's requests for medical assistance earlier in the day. According to prisoner Brock-Bey, the following occurred while he was locked in cell 5-201, and Geeter was in cell 5-205:

> At 2:00 PM I heard prisoner Geeter ask RUO Shubert to get the nurse for him because he was experiencing chest pains. I hear RUO Shubert tell Geeter "die

8

> bitch." I then also seen RN Amy make nurse rounds and come to Geeter's cell + tell him that "you are just faking."

(Pl. Ex. 9, Brock-Bey Aff.) According to prisoner John Nunley, the following occurred while he was at Chippewa Correctional Facility on June 5, 2005:

> RUO Shubert walked to the top of the stairs and yelled down to Nurse Dawn as she was making her medication round at around 6:00 PM and tell her dont worry about that peace of shit, theres nothing wrong with him, hes laying on the floor, you dont have to go over there I'll keep an eye on him, and Nurse Dawn said alright. RUO Wilkins was working the desk that day on second shift, there was prisoners on the floor where the guy needed medical attention trying to get help for the prisoner but all the correctional officers on second shift refused to get him help. It was third shift that finally got help for that prisoner.

(Pl. Ex. 10, Nunley Aff.)

Defendants contend that the testimony of these two prisoners cannot be true because neither prisoner was in a location to have seen or heard these alleged occurrences. (Dkt. No. 16, Defs.' Reply Br. 2.) In support of their contention Defendants rely on an affidavit of Ross Shubert that they contend will be filed separately under seal. (*Id.* at 3 n.1.) "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, — U.S. —, 127 S. Ct. 1769, 1776 (2007).

Defendants have not filed the affidavit referenced in their brief.[2] Accordingly,

---

[2] Although Defendants make reference to an affidavit that will be filed under seal, (Dkt. No. 16, Defs.' Reply Br., at pp. 2-3, n. 1, and Ex. 1), Defendants never sought leave to file this exhibit under seal and the exhibit has not been filed with the Court.

Plaintiff's prisoner affidavits have not been contradicted by other evidence, and for purposes of this summary judgment motion the Court is accordingly bound to view these affidavits in the light most favorable to Plaintiff. *Id*. Nevertheless, even if the prisoners' statements are believed, they do not create an issue of fact for trial because they only report on conversations that took place at 2:00 p.m and 6:00 p.m. There is no dispute that Defendants summoned a nurse at 7:30 p.m., that Geeter saw a nurse at 7:40 p.m., and that he refused medical care at that time. Geeter was not denied medical care, and Plaintiff has not come forward with any verifying medical evidence to suggest that any delay in medical treatment caused detriment to Geeter. The Court concludes that Plaintiff has not satisfied the objective component of his Eighth Amendment claims.

In addition, even if Plaintiff could satisfy the objective component of his claim, the evidence does not support a finding in Plaintiff's favor on the subjective component. "The subjective component requires an inmate to show that prison officials have 'a sufficiently culpable state of mind in denying medical care.'" *Blackmore*, 390 F.3d at 895 (quoting *Brown*, 207 F.3d at 867). "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "To satisfy

the subjective component of the adequate medical care test, an inmate must demonstrate that the official in question 'subjectively perceived a risk of harm and then disregarded it.'" *Johnson*, 398 F.3d at 875 (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)). "Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Blackmore*, 390 F.3d at 895-96 (quoting *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir.1994)).

Even though Plaintiff has presented evidence of delay in treatment and a culpable state of mind, there is no evidence in the record to support a finding that Defendants were aware of facts from which an inference could be drawn that a substantial risk of serious harm existed, or that they drew such an inference. In fact, it is undisputed that Defendants did seek medical assistance on Geeter's behalf, and that even the medical professional who came to treat Geeter did not perceive that there was a substantial risk of harm.

Viewing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff has not come forward with evidence of an Eighth Amendment violation and the Defendants are accordingly entitled to qualified immunity on Plaintiff's constitutional claim.

### III.

Having determined that Defendants are entitled to qualified immunity on Plaintiff's constitutional claim, the only remaining claims in this case are Plaintiff's state law claims for gross negligence and intentional infliction of emotional distress. Because no federal

11

claims remain, the Court must decide whether to exercise supplemental jurisdiction over the remaining state law claims.

District courts have discretion to refuse to exercise supplemental jurisdiction over state law claims if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "'When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed.'" *Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572, 583 (6th Cir. 2007)(quoting *Musson Theatrical v. Fed. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir.1996)). The decision on whether to exercise supplemental jurisdiction depends on "judicial economy, convenience, fairness, and comity." *Musson*, 89 F.3d at 1254 (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).

Because the Court is entering summary judgment on Plaintiff's federal claim on the grounds of qualified immunity at the early stages of this case, considerations of judicial economy, convenience, fairness, and comity do not weigh in favor of exercising supplemental jurisdiction over Plaintiff's state law claims. Plaintiff's state law claims will accordingly be dismissed without prejudice.

An order and judgment consistent with this opinion will be entered.


Date:   October 10, 2008                    /s/ Robert Holmes Bell
                                            ROBERT HOLMES BELL
                                            UNITED STATES DISTRICT JUDGE